12 CV 3584

WROBEL & SCHATZ LLP
1040 Avenue of the Americas, Suite 1101
New York, NY 10018-3703
Tel: (212) 421-8100
*Attorneys for Plaintiff*

RECEIVED
MAY 07 2012
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

NORTHERN SHIPPING FUNDS I, L.L.C.,

                Plaintiff,

       -against-

ICON CAPITAL CORP., BOA SUB C AS, BOA
DEEP C AS, BOA HOLDING AS, BOA OFFSHORE
AS, and TAUBÃTKOMPANIET AS,

                Defendants.

-----------------------------------------------------------------x

Index No.

**COMPLAINT**

       Plaintiff, Northern Shipping Funds I, L.L.C. ("Northern" or "Plaintiff"), by and through

its attorneys, Wrobel & Schatz, LLP, as and for its complaint against Defendants Boa Sub C AS,

Boa Deep C AS, Boa Holding AS, Boa Offshore AS, and Taubãtkompaniet AS (collectively

"Boa"), and Icon Capital Corp. ("Icon"), hereby alleges upon information and belief as follows:

<u>**Preliminary Statement**</u>

      1.     This action is related to, and arises from, a prior lawsuit before this Court

captioned *Icon Capital Corp. v. Boa Sub AS et al.*, 1:11-cv-01746-LBS-JCF (the "Prior Action").

In the Prior Action, Defendant Icon sued Boa due to its failure to complete an agreed-upon

financing transaction pursuant to a Commitment Letter dated September 17, 2010 (the

"Commitment Letter"), and, as the result of the leverage obtained by reason of Boa's default,

was able to settle the Prior Action. Upon information and belief, Boa paid Icon a substantial sum

of consideration as part of the settlement of the Prior Action.

2.      The reason for this lawsuit is that Icon did not exclusively own the rights under the Commitment Letter. Northern was a co-arranger and co-beneficiary of the Commitment Letter, and was a 50% owner of the rights and proceeds under the Commitment Letter. Northern was intimately involved in the negotiation, performance, and settlement discussions regarding the Commitment Letter, and was copied by both Icon and Boa on all communications concerning negotiation, performance, breach, and settlement of the Commitment Letter, until Icon unilaterally decided to settle those claims for its own exclusive benefit. Although Northern disagreed with Icon in bringing the Prior Action, and concerning settlement strategy and choice of counsel, it expressly advised Icon that Northern owned 50% of the claims being pursued in the Prior Action, that Northern did not waive its rights under the Commitment Letter, and that Northern expected Icon to protect those rights and to make clear to the parties and to the Court that Northern claimed rights under the Commitment Letter.

3.      Icon was incapable of performing under the Commitment Letter without Northern's participation and financial resources.

4.      Upon information and belief, Icon was only able to achieve a settlement of the Prior Action by failing to advise the Court and parties of Northern's position, despite Northern's specific instruction, prior to settlement, that it must do so, and by actively misrepresenting Northern's involvement in, and rights under, the Commitment Letter.

## I. PARTIES

5.      Plaintiff Northern Shipping Funds I, L.L.C. is a limited liability company registered in the Marshall Islands, with its office and principal place of business in the Marshall Islands.

6.      Defendant Icon Capital Corp. is a corporation organized under the laws of the State of Delaware, with its office and principal place of business at 100 Fifth Avenue, 4th Floor, New York, New York 10011.

7.      Defendant Boa Sub C AS is a Norwegian business entity with its office and principal place of business at Pir II, 13 A, 7010 Trondheim, Norway. In the Commitment Letter, Boa Sub C AS is identified as a Borrower on a joint and several basis with Boa Deep C AS.

8.      Defendant Boa Deep C AS is a Norwegian business entity with its office and principal place of business at Pir II, 13 A, 7010 Trondheim, Norway. In the Commitment Letter, Boa Deep C AS is identified as a Borrower on a joint and several basis with Boa Sub C AS.

9.      Defendant Boa Holding AS is a Norwegian business entity with its office and principal place of business at Pir II, 13 A, Kai 9, 7010 Trondheim, Norway. In the Commitment Letter, Boa Holding AS is identified as a Guarantor.

10.      Defendant Boa Offshore AS is a Norwegian business entity with its office and principal place of business at Pir II, 13 A, Kai 9, 7010 Trondheim, Norway. In the Commitment Letter, Boa Offshore AS is identified as a Guarantor.

11.      Defendant Taubåtkompaniet AS is a Norwegian business entity with its office and principal place of business at Pir II, 13 A, Kai 9, 7010 Trondheim, Norway. In the Commitment Letter, Taubåtkompaniet AS is identified as a Guarantor.

## II. JURISDICTION AND VENUE

12.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(2) and (3) under complete diversity, as this is a Civil Action between a citizen of the Marshall Islands, a citizen of the State of Delaware and the State of New York, and citizens of the foreign State of Norway, and as the matter in controversy exceeds the sum of $75,000 exclusive of interest and

costs. The Court also has supplemental or ancillary jurisdiction over the claims because they involve the same subject matter and necessary parties as the Prior Action.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(2), as a substantial part of the events giving rise to the claims occurred in this district. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(a)(3), as the Defendants are subject to personal jurisdiction in this district by purposely availing themselves to this jurisdiction through their acts and omissions. Venue is further proper pursuant to the terms of the Commitment Letter between the parties to this action, and because this action is intimately related to the Prior Action.

### III. <u>FACTS COMMON TO ALL CAUSES OF ACTION</u>

#### A. The September 17, 2010 Commitment Letter

14.     On or about September 17, 2010, Northern, Icon, and Boa entered into a binding contract known herein as the Commitment Letter. The Commitment Letter was a revision of prior versions containing similar terms dated August 25, 2010 and September 1, 2010 (the "Earlier Versions"). The stated purpose of the Commitment Letter was for the parties to enter into an approximately $70,000,000 loan, referred to as the Subordinated Secured Credit Facility (the "Transaction"), for the purpose of refinancing the vessels Boa Deep C and Boa Sub C, and for the general corporate refinancing of Boa. A copy of the Commitment Letter is attached hereto as Exhibit A.

15.     In the Commitment Letter, Northern and Icon are collectively identified as the "Arrangers" and the "Subordinated Lenders."

16.     In the Commitment Letter, Icon is also identified as the "Agent" and the "Security Trustee."

17.    The Commitment Letter was addressed to Mr. Ole T. Bjørnevik at Boa Offshore AS, and was signed by Mr. Bjørnevik. Upon information and belief, Mr. Bjørnevik is the Chairman of the Board for Borrower Boa Sub C AS, the Chairman of the Board and General Manager/Managing Director for Borrower Boa Deep C AS, and the Chairman of the Board/Managing Director for the Guarantors, Boa Holding AS, Boa Offshore AS, and Taubåtkompaniet AS.

18.    The Commitment Letter was drafted jointly by the Arrangers, Northern and Icon, and was to be signed by Mr. John Hartigan, the Senior Investment Manager for Northern, and Mr. C. Tobias Backer, the Senior Director of Icon. The corporate logos of both Northern and Icon appear at the top of each page of the Commitment Letter.[1] As indicated, Icon was incapable of performing under the Commitment Letter without Northern's participation and financial resources.

19.    The Term Sheet portion of the Commitment Letter details that the Borrowers are to use the proceeds from the Transaction to pay debt, taxes, and accounts payable as part of the refinancing of the Boa group of companies, and for "general corporate purposes." The loan was to bear interest at the rate of 15.75% per annum.

---

[1] Northern has been unable to locate a version of the Commitment Letter containing its signature, and it appears from court papers in the Prior Action that Icon will attempt to argue from the lack of a copy of the Commitment Letter containing Northern's signature that Northern is not an intended party to the Commitment Letter. Such an argument would be a knowing misrepresentation of the facts. Northern signed all the Earlier Versions, negotiated and approved Boa's final changes to the Commitment Letter on behalf of both Northern and Icon, performed all of its duties under the Commitment Letter, was consulted by both Icon and Boa concerning the performance, breach, and settlement of the Commitment Letter, was asked by Icon to participate as a co-plaintiff in the Prior Action – a request that would be nonsensical were not Northern a co-owner of the claims -- and was at all times a co-venturer with Icon concerning the transactions contemplated under the Commitment Letter.

20.     The Commitment Letter's Term Sheet sets forth the fees to be paid to the Arrangers. These are the Upfront Fee, designated as 2% of the loan amount, $1,400,000, and the Arrangement Fee, designated as 1.5% of the loan amount, $1,050,000. *See* Exhibit A at p. 6.

21.     In addition, the Term Sheet sets forth that Boa was to pay $300,000 of the Arrangement Fee to the Arrangers at the time the Commitment Letter was signed. Boa complied with this term and paid Icon $299,985 in its capacity as Agent. *See* Exhibit A at p. 6.

22.     The Commitment Letter's Term Sheet also provides that:

> "In the event the Facility fails to close because the Borrowers actively or constructively break off from the negotiation, due diligence or documentation process, then the Borrower will pay on demand a sum equivalent to 50% of the sum of the Upfront Fee and the Arrangement Fee less any amount paid to the Arrangers on issuance of the commitment letter."

*See* Exhibit A at p. 7.

### B. Boa's Breach of the Commitment Letter, Icon and Northern's Disagreement Concerning Strategy

23.     On December 15, 2010, shortly before the Transaction was expected to close, Boa informed Northern and Icon via email that Boa was withdrawing from the Transaction. At that point, Northern had performed all necessary steps towards closing and was ready, willing, and able to close. Northern arranged for several other parties to participate in the financing contemplated by the Commitment Letter.

24.     After Boa's withdrawal from the Transaction, on or about December 23, 2010, Northern and Icon advised Boa that, based on the terms of the Commitment Letter, they were entitled to no less than 50% of the Upfront and Arrangement Fees as well as reimbursement of all legal fees, travel costs, and other expenses incurred by Northern and Icon in preparing the

Transaction.[2] Northern performed the calculation of fees and expenses at Icon's request, and Northern and Icon jointly transmitted the figures to Boa that Icon used to prepare its claim.

25.     On or about January 20, 2011, Icon informed Northern of its intention to pursue legal action against Boa for withdrawing from the Transaction, and inquired as to whether Northern was interested in joining the suit. Northern declined, stating its preference to reach a settlement with Boa through negotiation. Additional reasons for Northern's hesitation were that Boa was close to bankruptcy, and that Icon refused to consult Northern about choice of counsel or litigation strategy. During this exchange, Northern reminded Icon of its duty to represent and protect Northern's interests in any legal action against Boa.

26.     Northern also reminded Icon that Northern did not and would not waive its rights under the Commitment Letter at in-person meetings in Hamburg, Germany on or about February 24, 2011 and in New York City on June 23, 2011, and in emails dated May 20, 2011 and May 31, 2011.

27.     In the May 20, 2011 email, for example, Northern reminded Icon "Of course, Northern Shipping Funds owns a share of the claims you are pursuing in the lawsuit" and that Northern was still seeking a consensual resolution from Boa on behalf of both Northern and Icon. In the May 31, 2011 email, Northern reminded Icon that Northern "ha[s] not waived or otherwise transferred [its] rights regarding [its] portion of the BOA fees." Similar statements were made by Northern to Icon before Icon filed the lawsuit and after, and Icon never contradicted Northern's statements that it owned half the claims until after it obtained the default and settlement was imminent.

---

[2] Under the parties' agreement and course of performance, Northern was to arrange for more than 50% of the financing for the intended transactions and was arguably entitled to a larger share of the associated fees.

## C. The Prior Action

28.     By Complaint dated March 14, 2011, Icon initiated the Prior Action against Boa in the United States District Court for the Southern District of New York (the "Complaint") (Prior Action Docket Sheet No. 1).

29.     After Northern informed Icon that it would not initially join in the Complaint and share in expenses due to disagreements over strategy and counsel, Icon refused to keep Northern informed concerning the status of the Prior Action.

30.     Icon intentionally bowdlerized the Complaint and subsequent filings to minimize or misstate Northern's involvement in the Commitment Letter and performance under the Commitment Letter, despite Northern's specific instruction to Icon that it should disclose Northern's claim to rights under the Commitment Letter.

31.     Icon served Boa a copy of the Complaint in Norway. Instead of answering, Boa sought to negotiate a resolution of the claims, both with Icon and with Northern. Without notice or warning to Boa, while discussing settlement, Icon obtained a default judgment against Boa on July 11, 2011 (Prior Action Docket No. 5).

32.     Boa thereafter moved for relief from the default. *See* Prior Action Docket No. 9 (Notice of Motion to Vacate Default Judgment); No. 11 (Declaration of Charles Michael Gillis in Support of Motion to Vacate Default Judgment); No. 12 (Memorandum of Law in Support of Defendant's Motion to Vacate Default Judgment). Icon opposed Boa's motion. *See* Prior Action Docket No. 16 (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Vacate Default); No. 17 (Declaration of C. Tobias Backer in Opposition to Defendant's Motion to Vacate the Default Judgment ("Backer Declaration"). In its papers, although Icon continued to misrepresent or omit to disclose Northern's rights under the Commitment Letter, Boa

nonetheless inadvertently revealed documents demonstrating both Icon's and Boa's recognition of Northern's rights. *See, e.g.*, Backer Dec. Exh. 1 (Boa thanks Northern and Icon for the revised term sheet, and notes Northern's joint status with Icon as arranger); Backer Dec. Exh. 3 (Boa notes states it is withdrawing from deal "with Icon/Northern"; Icon responds for both Icon and Northern ("we"); all parties include Northern on all communications); Backer Dec. Exh. 4 (settlement demand by Icon for both Northern and Icon); Backer Dec. Exh. 5 (settlement proposal by Boa of amounts it "owe[s] ICON/NORTHERN") (emphasis in original).

33.    After oral argument on September 26, 2011 (Prior Action Docket No. 20), the Court referred the matter for settlement before Magistrate Judge Francis.

**D. Icon's unilateral settlement of claims that belonged to Northern, knowing that Northern continued to assert those claims, apparently based upon false representations to the Court and to Boa**

34.     Upon information and belief, on or about January 19, 2012, Boa and Icon reached an agreement to settle the Prior Action.

35.     Icon failed to inform Northern that it had settled the action, or even that settlement discussions were occurring. Icon has also sought to hide the terms of the settlement from Northern, and has refused Northern's written requests, through counsel, that it disclose those terms.

36.     Upon information and belief, Icon was only able to achieve a settlement of the Prior Action by failing to advise the Court and parties of Northern's position, despite Northern's specific instruction, prior to settlement, that it must do so, and by actively misrepresenting Northern's involvement in, and rights under, the Commitment Letter.

37.     For example, upon information and belief, when Boa asserted at the settlement conferences that Northern was a necessary party, Icon allegedly represented that Northern had never signed the Commitment Letter (misleading at best, false at worst), that Northern had never made a claim under the Commitment Letter (egregiously false), that Northern did not own any part of the claims (false and known by Icon to be disputed), and that Northern had refused to join the claims (materially misleading).

38.     Upon information and belief, Boa paid Icon $750,000 to settle the Prior Action, far more than Icon's 50% share of the contractual damages, and further waived all rights to earnest money deposit of approximately $300,000, which Icon had previously agreed to split with Northern.

## IV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Breach of Contract as to Icon)

39.     Northern and Icon are parties to the Commitment Letter that constitutes a valid, enforceable, and binding contract.

40.     Pursuant to the terms of the Commitment Letter, Northern was entitled to be reimbursed by Boa for all fees, costs, and expenses associated with preparing the Transaction, and was entitled to 50% of the amount of the contractual damages that Boa was required to pay based on its unilateral withdrawal from the Transaction. By entering into a settlement agreement with Boa based upon the entire amount due under the Commitment Letter and not paying any of the settlement to Northern, Icon violated the terms of the Commitment Letter contract.

41.     As a direct and proximate result of the Icon's breach of the Commitment Letter contract, Northern has suffered damages in an amount to be determined at trial, but in no event less than $569,753, plus interest and costs thereon.

### SECOND CAUSE OF ACTION
(Unjust Enrichment as to Icon)

42.     Throughout its dealings with Boa and Icon, Northern has carried out its responsibilities and acted in good faith.

43.     Despite Northern's considerable efforts in the arrangement of the Transaction and the drafting of the Commitment Letter, Icon has prevented Northern from realizing the benefits of these efforts by claiming the entire contractual damages payment from Boa for itself.

44.     As a direct and proximate result these events Icon has been unjustly enriched at the expense of Northern. Northern has suffered damages in an amount to be determined at trial,

but in no event less than $569,753, plus interest and costs thereon. Equity and good conscience cannot allow Icon to keep this amount at Northern's expense.

### THIRD CAUSE OF ACTION
(Money Had and Received as to Icon)

45.     Pursuant to the terms of the Commitment Letter, Icon and Northern were each entitled to a portion of all payments made by Boa, including those that were the result of Boa's withdrawal from the Transaction. Northern was entitled to 50% of any payments made by Boa.

46.     On or about January 19, 2012, Icon entered into a settlement agreement with Boa to resolve Boa's entire obligation under the Commitment Letter for withdrawing from the Transaction.

47.     Icon has refused to share the payment from this settlement with Northern, despite Northern's rights to it under the terms of the Commitment Letter.

48.     Under principles of equity and good conscience, Icon should not be permitted to retain Plaintiff's portion of contractual damages payment from Boa.

49.     As a direct and proximate result of Icon's actions, Northern has suffered damages in an amount to be determined at trial, but in no event less than $569,753, plus interest and costs thereon.

### FOURTH CAUSE OF ACTION
(Constructive Trust as to Icon)

50.     Under the terms of the Commitment Letter, Icon and Northern were co-venturers as Arrangers and Lenders for the Transaction. Further, Icon was designated as the Agent for the Transaction.

51.     When Icon informed Northern of its intent to initiate a lawsuit against Boa for breaching the terms of the Commitment Letter, Icon was made aware by Northern of Icon's duty to protect Northern's interests during the suit.

52.     Icon did not represent Northern's interests in seeking damages from Boa. In fact, Icon did not mention Northern's participation in the Transaction in any of the documents it filed as part of its suit against Boa.

53.     On or about January 19, 2012, Icon entered into a settlement agreement with Boa to resolve Boa's entire obligation under the Commitment Letter for withdrawing from the Transaction. Icon has claimed the entire settlement amount for itself, despite Northern's rights under the Commitment Letter.

54.     Under principles of equity and good conscience, Icon should not be permitted to retain Northern's portion of the cancellation payment from Boa.

55.     As a direct and proximate result of Icon holding money to which Northern is entitled, Northern has suffered damages in an amount to be determined at trial, but in no event less than $569,753, plus interest and costs thereon.

## FIFTH CAUSE OF ACTION
(Breach of Fiduciary Duty as to Icon)

56.     Icon and Northern were co-venturers through the Commitment Letter, where both were designated as Arrangers and Lenders of the Transaction. In addition, the Commitment Letter designated Icon as the Agent for the Transaction.

57.     During the course of its suit against Boa, Icon was required to represent and protect Northern's interests. However, Icon did not meet this requirement and left any mention of Northern's participation in the Transaction out of its complaint and other legal documents.

58.     Icon acted in wrongly by entering into a settlement agreement with Boa without Northern's knowledge, and attempting to claim all of the contractual damages payment for itself. This settlement would terminate Northern's right to claim damages from Boa under the Commitment Letter.

59.     As a direct and proximate result of Icon's failure to represent and protect Northern's interests in Icon's dealings with Boa, Northern has suffered damages in an amount to be determined at trial, but in no event less than $569,753, plus interest and costs thereon.

## SIXTH CAUSE OF ACTION
(Breach of Contract as to Boa)

60.     Northern and Boa are parties to the Commitment Letter, which constitutes a valid, enforceable, and binding contract.

61.     Pursuant to the terms of the Commitment Letter, Boa Sub C AS and Boa Deep C AS, the Borrowers under the Commitment Letter, had an obligation to reimburse Northern for all fees, costs, and expenses associated with preparing the Transaction, and to pay Northern and Icon 50% of the Arrangement and Upfront Fees on the basis of Boa's unilateral withdrawal from the Transaction.

62.     Despite due demand, Boa Sub C AS and Boa Deep C AS did not and have not met this contractual obligation to Northern, and are in breach of the Commitment Letter contract.

63.     Pursuant to the terms of the Commitment Letter, Boa Holding AS, Boa Offshore AS, and Taubåtkompaniet AS, the Guarantors under the Commitment Letter, had an obligation to reimburse Northern for all fees, costs, and expenses associated with preparing the Transaction, and to pay Northern and Icon 50% of the Arrangement and Upfront Fees, based on the default of the Borrowers and the Borrowers' refusal to pay same.

64.     Despite due demand, Boa Holding AS, Boa Offshore AS, and Taubåtkompaniet AS  have failed and refused to meet their obligations as Guarantors of the Borrowers' liabilities under the Commitment Letter and are in breach of the Commitment Letter contract.

65.     As a direct and proximate result of Boa's refusal and failure to meet its contractual obligations, Northern has suffered various damages in an amount to be determined at trial but in no event less than $569,753, plus interest and costs thereon.

## VI. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Northern Shipping Funds I, L.L.C. requests that the Court enter judgment in its favor and against Defendants as follows:

a) On the First Cause of Action for Breach of Contract against Icon in the amount of and no less than $569,753;

b) On the Second Cause of Action for Unjust Enrichment against Icon in the amount of and no less than $569,753;

c) On the Third Cause of Action for Money Had and Received against Icon in the amount of and no less than $569,753;

d) On the Fourth Cause of Action for Constructive Trust against Icon in the amount of and no less than $569,753;

e) On the Fifth Cause of Action for Breach of Fiduciary Duty against Icon in the amount of and no less than $569,753;

f) On the Sixth Cause of Action for Breach of Contract against Boa in the amount of and no less than $569,753;

g) For costs, disbursements, and expenses including reasonable attorney's fees as to all causes of action;

h) For pre- and post-judgment interest at the maximum rate allowed by law as to all causes of action; and

i) For any other legal or equitable relief to which it is entitled, or that the Court deems appropriate.

Dated: New York, New York
       May 4, 2012

WROBEL & SCHATZ LLP

By: _____
Philip R. Schatz, Esq.
1040 Avenue of the Americas, Suite 1101
New York, NY 10018-3703
Tel.: (212) 421-8100

# Exhibit A

 

September 16, 2010

Ole T. Bjørnevik
Boa Offshore AS
Pir II 13A Kai 9
7010 Trondheim
Norway

RE: Commitment Letter for USD 70,000,000 Subordinated Secured Credit Facility

Dear Mr. Bjørnevik:

You have advised ICON Capital Corp. ("ICON") and Northern Shipping Fund I L.L.C. ("Northern") (collectively the "Arrangers") and the investor syndicate led by them (the "Investors") that Boa Deep C AS and Boa Sub C AS (the "Borrowers") and Boa Holding AS ("Boh") intend to enter into an approximately USD 70,000,000 Subordinated Secured Credit Facility (the "Facility" or the "Transaction") for the financing of the *Boa Deep C* and the *Boa Sub C* in accordance with the terms set forth in the Term Sheet attached hereto as Exhibit A (the "Term Sheet", and together with this letter, the "Commitment Letter").

You have agreed that the Arrangers will act as lead investors for the Transaction and you agree that you will actively assist Arrangers and the Investors in consummating the Transaction. Such assistance shall include but not be limited to direct contact between you and your executive management and the Investors, and you shall request that representatives of Fokus Bank, GIEK, Greenway and others make themselves available to discuss the transaction with the Investors. Except for Pareto Securities, no additional arrangers, agents or trustees will be appointed other than as expressly contemplated by this Commitment Letter and any other agreement entered into by you and the Arrangers.

The Arrangers are pleased to confirm that they are willing to commit to the Transaction on the terms and conditions set forth herein and in the Term Sheet. The Transaction is subject to the following:

(i)     there not occurring on or prior to the closing date of the Transaction (the "Closing Date"), any condition or circumstance not previously known to the Investors which it shall become aware of and shall reasonably determine has had, or could reasonably be expected to have, a material adverse effect (each, a "Material Adverse Effect") (a) on the rights or remedies of the Investors, (b) on the ability of the Borrowers or the Guarantors, to perform their respective obligations with respect to the Transaction or (c) on the property, assets, nature of assets, operations, liabilities, condition (financial or otherwise), or prospects of the Guarantors and Aker Marine Contractors AS ("AMC");

(ii)    the Investors not becoming aware, between the date hereof and the Closing Date, of any information not previously known to it which it reasonably believes is materially negative



  

information with respect to the Transaction or condition (financial or otherwise), property, business, operations, assets, nature of assets, liabilities or prospects of Boa or AMC which is inconsistent in a material and adverse manner with any such information or other matter disclosed to the Investors prior to the date hereof;

(iv)    The Arrangers having secured consent and final approval from the other Investors, GIEK, Eksportfinans and Fokus Bank;

(v)     Boa having secured the requisite consents and waivers from Greenway Offshore Pte Ltd and Greenway Holding to allow the Arrangers to close the Transaction;

(vi)    The other conditions set forth or referred to in the Term Sheet; and

(vii)   Payment of USD 300,000 of the Arrangement Fee to ICON. The funds shall be paid with a value date on or before September 17, 2010 to the following bank account:

> ICON Capital Corp.
> JP Morgan Chase
> New York, NY
> ABA: 021 000 021
> Swift: CHASUS33
> Account: 590413724

To induce the Investors to issue this Commitment Letter, you hereby agree that all reasonable out-of-pocket fees and expenses of ICON, Northern and the Investors (including the fees and expenses of counsels or consultants employed by the Investors), whether or not the Facility is made available or definitive credit documents are executed in connection therewith. You further agree that the obligation to enter into the Transaction is contingent upon definitive documents, in form and substance satisfactory to the Arrangers, the Investors, Boa and the Borrowers, being executed and the conditions precedent thereunder being performed or waived to the satisfaction of the Investors.

You further agree to indemnify and hold harmless the Investors and each director, officer, employee and affiliate of each (each an "**Indemnified Person**").

This Commitment Letter is issued for your benefit only and no other person or entity may rely hereon. Neither the Arrangers nor any other Indemnified Person shall be responsible or liable to you or any other person for (i) any determination made by it pursuant to this letter in the absence of bad faith, gross negligence or willful misconduct on the part of such person (as determined by a court of competent jurisdiction in a final judgment) or (ii) any consequential damages which may be alleged as a result of this letter or the financing contemplated hereby.

The Arrangers reserve the right to employ the services of their affiliates in providing services contemplated by this Commitment Letter and to allocate, in whole or in part, to such affiliates certain fees payable to the Arrangers in such manner as the Arrangers and such affiliates may agree in their sole discretion. You also agree that the Arrangers may at any time and from time to time assign all or any portion of its commitments hereunder to one or more of its affiliates. You acknowledge that, in connection with the Facility, each of the Investors may share, with any of its







affiliates, and such affiliates may share with each of the Investors, any information related to Boa, AMC or any of the matters contemplated hereby.

You agree that this Commitment Letter is for your confidential use only and that, unless the Arrangers have otherwise consented, neither its existence nor the terms hereof will be disclosed by you to any person or entity other than your directors, officers, employees, accountants, attorneys or other advisors, those of your affiliates, officers, employees, accountants, attorneys or other advisors, or as required by applicable law and compulsory process. If this Commitment Letter is not accepted by you as provided below, please immediately return this letter (and any copies hereof) to the undersigned.

The provisions of the immediately preceding five paragraphs shall survive any termination of this Commitment Letter.

This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and the Arrangers. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof or thereof, as the case may be. This Commitment Letter sets forth the entire agreement between the parties as to the matters set forth herein and supersedes all prior communications, written or oral, with respect to the matters herein.

If you are in agreement with the foregoing, please sign and return to ICON (including by way of facsimile transmission) the enclosed copy of this Commitment Letter no later than 5:00 P.M., New York time, on September 17, 2010. Unless otherwise agreed, our willingness to arrange the Transaction shall terminate on September 17, 2010.

THIS COMMITMENT LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, AND ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, ACTION, SUIT OR PROCEEDING ARISING OUT OF OR CONTEMPLATED BY THIS COMMITMENT LETTER IS HEREBY WAIVED. THE PARTIES HERETO HEREBY SUBMIT TO THE NON-EXCLUSIVE JURISDICTION OF THE FEDERAL AND NEW YORK STATE COURTS LOCATED IN THE CITY OF NEW YORK IN CONNECTION WITH ANY DISPUTE RELATED TO THIS COMMITMENT LETTER OR ANY MATTERS CONTEMPLATED HEREBY OR THEREBY.

Yours Faithfully,

On behalf of the Arrangers

C. Tobias Backer
Senior Director
ICON Capital Corp.

John Hartigan
Senior Investment Manager
Northern Shipping Funds

  

### Exhibit A
### Term Sheet

**Facility Purpose:**   The Borrowers shall use the proceeds from this Facility (as defined below), for payment of deferred senior debt service installments and cure of minimum liquidity covenants under the Senior Facilities loan agreements of the Borrowers, settlement of overdue taxes and accounts payable of the Borrowers, provision of loans to associated companies as part of a refinancing of the Boa group of companies, and for general corporate purposes.

**THE PARTIES**

**Borrowers:**   Boa Sub C AS and Boa Deep C AS on a joint and several basis.

**Guarantors:**   Boa Holding AS ("Boa"), Boa Offshore AS and Taubåtkompaniet AS.

**Arrangers:**   ICON and Northern.

**Subordinated Lenders:**   ICON and Northern or their assigns together with a syndicate of financial institutions and other entities arranged by the Arrangers.

**Agent:**   ICON.

**Security Trustee:**   ICON.

**Senior Lender:**   Eksportfinans AS, guaranteed by Fokus Bank and GIEK.

**Swap Provider:**   Fokus Bank.

**Lessor:**   Naviera del Guadiana AIE.

**THE FACILITIES:**
**Senior Facilities[1]:**   Boa Sub C – Tranche 1 – NOK 246,607,340 and Tranche 2 USD 37,500,000.

Boa Deep C – Tranches 1) EUR 8.505,320 and Tranche 2) EUR 21,666,666.

Both Senior Facilities are non- recourse to the Guarantors.

---

[1] Outstanding amount assumed as of March 31, 2010

 

| | |
|---|---|
| **Subordinated Loan Facility (the "Facility"):** | Subordinated loan facility in the amount of USD 70,000,000 – USD 72,500,000 ("Facility Amount") at the discretion of the Arrangers. |
| **Collateral Vessels:** | *Boa Sub C* an Offshore Construction/Flexi Pipe Laying Vessel built in 2007 by Factorias Vulcano Spain S.A. at Vigo Spain ("*Sub C*"). |
| | *Boa Deep C* an offshore construction vessel built in 2003 by Factorias Vulcano Spain S.A. at Vigo Spain ("*Deep C*"). |
| **Timecharters:** | Five (5) year timecharter between Boa Sub C AS and Aker Marine Contractors AS ("AMC") signed on the August 17, 2005 and firm until September 29, 2012 and a five (5) year timecharter between Boa Deep C AS and AMC signed on May 31, 2009 and firm until August 19, 2013. |
| **Bareboat Charter:** | Bareboat charter between the Lessor and Boa Deep C AS. |
| **Vessel Management Agreements:** | Agreements between the Borrowers and Taubåtkompaniet AS (the "Manager") governing the commercial and technical management of the Collateral Vessels. |
| **Spanish Tax Lease:** | Spanish lease structure means that certain tax lease transaction and underlying agreement made pursuant to Spanish Law 43/1995 on corporate tax allowing the Lessor to depreciate the *Deep C* on a accelerated basis, whereby the Borrower, had on delivery of the *Deep C* transferred title of the *Deep C* to the Lessor and the Lessor has transferred possession of the *Deep C* to the Borrower Under the terms of such lease, Boa Deep C AS may repurchase the *Deep C* on December 18, 2010. Boa Deep C AS must exercise such purchase option within 60 days of exercise date. |
| **Closing Date:** | Signing of the definitive transaction documents (the "Closing Date") shall occur on a date not later than 45 days from acceptance of this letter or such other date mutually agreed between the parties. |
| **Drawdown:** | Subject to Conditions Precedent being fulfilled and a minimum of 3 days advance notice, drawdown shall be in the aggregate amount of the Facility in two tranches on the Closing Date. |
| **Facility Allocation:** | Amounts drawn down under the Facility shall be allocated in two Tranches between the Borrowers as follows: |

Boa Deep C AS      60% (Tranche 1)
Boa Sub C AS       40% (Tranche 2)



 

| | |
|---|---|
| **Maturity:** | Five (5) years from the Closing Date. |
| **Repayment:** | The Facility shall be repaid through quarterly installments of USD 1,500,000, first time payable on March 31, 2011 and the final balance due at Maturity. |
| **Cash sweep:** | All excess free cash to be swept semi-annually, starting on the six (6) month anniversary of the Closing Date for the purpose of extraordinary prepayments of the Facility. |
| **Mandatory Prepayments:** | Upon the total loss or sale of the *Deep C*, the Borrowers shall use the net cash proceeds to prepay that portion of the Facility outstanding under the Tranche allocated to the *Deep C*. Upon the total loss or sale of the *Sub C*, the Borrowers shall use the net cash proceeds to prepay that portion of the Facility outstanding under the Tranche allocated to the *Sub C* and up to 50% of the outstanding amount under the Tranche allocated to the *Deep C*. |
| **Voluntary Prepayments:** | No prepayments in the first two years of the Facility except in the event of a total loss. Beginning in year three (3) of the Facility and subject to 10 days written notice and payment of the Prepayment Fee the Borrowers are permitted to make partial or full prepayments under the Facility. Any partial prepayment shall be in an amount of not less than USD 1,000,000. Such voluntary prepayments shall be applied in the inverse order of maturity. |
| **Interest Rate:** | Interest shall be at a rate of 15.75% per annum. |
| | Interest will be calculated on actual/360-day basis and payable quarterly in arrears. |
| **Default Rate:** | Overdue principal and interest thereon and any other amounts past due under the Facility shall bear interest at the rate which is 3% in excess of the Interest Rate. |
| **Upfront Fee:** | 2.0% of the Facility Amount, payable at Drawdown. |
| **Arrangement Fee:** | 1.5% of the Facility Amount, USD 300,000 of which shall be Payable to the Arrangers on acceptance of this Commitment Letter and the balance shall be payable at Drawdown. |
| | In the event the Facility fails to close because the Borrowers are unable to satisfy the Closing Conditions, excluding those Closing Conditions |





numbered 2, 6, 10, 11 and 12, the Borrowers shall pay on demand half of the Arrangement Fee less any amount paid to the Arrangers on acceptance of the Commitment Letter. The Arrangers shall retain that portion of the Arrangement Fee paid as liquidated damages for loss of bargain and not as penalty.

In the event the Facility fails to close because the Borrowers actively or constructively break off from the negotiation, due diligence or documentation process, then the Borrower will pay on demand a sum equivalent to 50% of the sum of the Upfront Fee and the Arrangement Fee less any amount paid to the Arrangers on issuance of the Commitment Letter.

**Prepayment Fee:**   All Mandatory Prepayments and Voluntary Prepayments after the first two years shall be subject to a prepayment fee of 5% of the prepaid amount, except in the event of a total loss.

If the Borrowers enter into a sale and leaseback transaction for the *Deep C* and the *Sub C* with the Arrangers no prepayment penalty or prepayment limitations shall apply.

The Arrangers undertake to enter into negotiations of said sale leaseback transaction in good faith within six (6) months of the Closing Date.

**SECURITY:**   Those security documents customary for this type of Facility, including but not limited to the following:

Collateral Vessels:
- Mortgages over the Collateral Vessels, ranking behind only the Senior Lender and Swap Providers.
- Assignment of earnings and insurances on the Collateral Vessels, ranking behind only the Senior Lender and Swap Providers.
- Second priority assignment of the *Bon Deep C* Bareboat Charter with full step in rights.
- Second priority pledge of shares of the Borrowers.
- Second priority pledge of Borrowers' bank accounts, including bank accounts holding minimum working capital as required under the Senior Facilities.
- First priority interest in the intercompany loans made from the proceeds under this Facility.
- Guarantee from Taubåtkompaniet AS.
- Guarantee from Boa.
- Guarantee from Boa Offshore AS.



 

In the event that SpareBank 1 SMN and GIEK require that the proceeds of this Facility be used prepay the loans financing the *Boa Thalassa* and *Boa Galatea*, a second lien security interest in the *Boa Thalassa* and *Boa Galatea* shall be granted to the Subordinated Lenders.

**Co-Ordination Agreements:**

The Agent and the Senior Lender shall enter into an inter-creditor agreement (one for each Collateral Vessel) acceptable to all parties. Such agreements shall be negotiated amongst the Senior and Subordinated Lenders and will address consent rights, cure rights, payment priority and any other applicable inter-creditor issues and shall include but not be limited to the following:

- In an event of default the Subordinated Lenders shall have the right to acquire the Senior Facilities without the prior written consent of the Borrowers or Guarantors.
- The sale of the Collateral Vessels shall require the consent of the Subordinated Lenders unless the net sales proceeds of such sale is sufficient to repay the Senior Facility and the Facility together with any overdue interest payments, default interest payments, or amounts due to the Senior Lender and the Subordinated Lenders. In the event the net proceeds of such sale is insufficient to repay the Senior Facilities and the Facility in full, the Senior Lender shall grant a period of time sufficient to allow the Subordinated Lenders to arrange an orderly sale of the Collateral Vessels or to refinance the Senior Lender. Such period shall be defined and mutually agreed in documentation.
- The Subordinated Lender to be notified of all changes to the Senior Facility. Any material changes to the Senior Facilities which may negatively impact the Subordinated Lenders shall require the consent of the Subordinated Lenders.
- Any change in the Manager shall require the consent of the Subordinated Lenders.

**Co-Ordination Waterfall:**

All earnings or net proceeds from the sale of a Collateral Vessel will be applied in the following priority:

1. First to cover interest payments, fees and agreed expenses due to the Senior Lender under the respective Senior Facility.
2. Second to cover payment of principal payments due to the Senior Lender under the respective Senior Facility.
3. Third to cover payment of net settlement amounts due under any swap agreements related to a Collateral Vessel entered into with the Swap Provider prior to the date of this Facility.
4. Fourth to cover interest payments, fees and expenses due to the Subordinated Lenders under the Facility.







5. Fifth to cover payment of principal due to the Subordinated Lenders under the Facility.
6. Sixth, all other amounts shall be applied towards any amounts due to the Senior Lender on the remaining Collateral Vessel.
7. Seventh, all other amounts shall be applied towards any amounts due to the Subordinated Lenders on the remaining Collateral Vessel tranche.
8. Eight, all other amounts are for the account of the Borrowers.

In the event both Collateral Vessels are sold simultaneously the order of the distribution of the proceeds under the Co-Ordination Waterfall shall remain the same from points 1-7 with any shortfall on either Collateral Vessel Tranche to be settled prior to any excess amounts being distributed to the Borrowers under point 8.

| | |
|---|---|
| **Representations and Warranties:** | Usual and customary for transactions such as this. |
| **General Covenants:** | Usual and customary for transactions of this size, type and purpose and include but not be limited to the following: |

- The Agent shall have the right to inspect the Collateral Vessels once per year upon prior written notice to the Borrowers and the cost incurred shall be for the account of the Borrowers.  The Agent shall endeavor to minimize the interruption of the ordinary operation of the Collateral Vessels.
- The Borrower shall ensure that at all times the Collateral Vessels are properly and adequately insured at the Borrowers' expense. Such insurance shall include Hull and Machinery, P&I, MII MIAPP, ~~and Loss of Hire insurances.~~ 
- The Borrowers shall exercise its call option at the earliest date permitted under the Bareboat Charter on the *Deep C* (December 2010).
- Compliance with laws.
- The Collateral Vessels will be registered at all times with a shipping registry and under such flag as shall be acceptable to the Agent. Upon exercise of the purchase option, the *Deep C* shall be reflagged to a flag that is acceptable to the Agent.
- Employment of Collateral Vessels exceeding 12 months shall require the consent of the Agent.
- The Manager shall remain Taubåtkompaniet AS and the Agent shall retain the right to change the Manager if the Subordinated Lenders are not satisfied with the Manager's performance.
- The Borrowers and Guarantors to provide an indemnity to the Subordinated Lenders against any tax obligations or other liabilities that might arise now or in the future with regard to the Spanish lease structure or otherwise.







- The Borrowers shall deliver commercial and technical data that the Agent may reasonably require.
- The Manager shall at all times comply with all relevant international and domestic regulations pertaining to the operation of vessels, included but not limited to the ISM code.

The Subordinated Lenders shall use reasonable efforts to replicate the covenants of the Senior Facilities loan agreements.

**Reporting Covenants:**

The Borrowers and Guarantors to provide annual audited financial statements to the Agent within 120 days of the preceding year end.

The Borrowers and Boa to provide unaudited semi-annual management reports by September 30th of each year during the Facility.

The Borrowers and Boa Holding AS to provide quarterly compliance certificates within 90 days of the end of each quarter which sets forth the Financial Covenant calculations and provides information required in order to confirm compliance with the Financial Covenants.

Monthly cash flow statements within two weeks after respective month end.

**Negative Covenants:** Usual and customary for transactions of this type including but not limited to the following:
- No dividend payments by Boa other than dividend amounts sufficient to cover personal tax levies of the shareholders (including Ole Bjørnevik) without the Subordinated Lenders' prior written approval, which shall not be unreasonably withheld. No other distributions of capital stock or payments under shareholders or subordinated/related party loans.
- No change of ownership or control of the Borrowers or Guarantors.
- Ole Bjørnevik to remain the principal shareholder of Boa.
- No material change of business activity of Boa.
- No mergers, consolidations.
- No additional indebtedness or guarantees by the Borrowers.
- No new intercompany guarantees or security in any form to be existing or provided by the Borrowers to affiliates of Boa unless they are fully subordinated to this Facility at the date of closing
- No intercompany transfers or payments other than for amounts due under the Vessel Management Agreements.
- Borrower limitations on capital expenditures with the exception of drydocking, repair and maintenance expenses (to be agreed with the Guarantor).







- Borrowers shall not permit additional encumbrances or liens against the Collateral Vessels.
- Borrowers shall not sell the Collateral Vessels without the consent of the Subordinated Lenders, unless the Facility is paid off in full.
- Other conditions customary for this type of transaction.

**Value Maintenance Clause:**

Minimum Value of the Collateral Vessels shall at all times be 125% of the amounts outstanding under the aggregate of the Facility and Senior Facilities at all times.

The Borrower shall semi-annually provide the Subordinated Lenders with appraisals of the Collateral Vessels – on a charter-free basis - from two approved brokers appointed by the Senior Lender. The Subordinated Lenders reserve the right to appoint separate appraisers for the purpose of measuring the Value Maintenance Clause.

**Financial Covenants:**

Those financial covenants applicable under the Senior Facilities for the Borrowers and Guarantors on a consolidated basis and to be measured semi-annually.

No additional equity financed capital expenditures other than normal maintenance capital expenditure and Permitted Capital expenditures as outlined in Appendix A.

Any additional newbuilding capital expenditures shall be fully financed with no additional equity funded either directly or indirectly by the Borrowers or Boa until such time as the Subordinated Lenders agree that the Borrowers' and Boa's current liquidity shortfall has been satisfactorily addressed and the Borrowers and Boa maintain a liquidity as deemed prudent for vessels of *Deep C/Sub C's* capability, design and contract status; such permission not to be unreasonably withheld.

**Events of Default:**

Events of Default under the Facility shall include but not be limited to:
- Borrower defaults on any of its obligations under this Facility.
- Cross Default with other material indebtedness of the Borrowers and the Guarantors; not to include potential events of default for Boa Offshore AS in connection with the tugs referred to in Appendix A.
- The Borrowers and/or the Guarantors become insolvent, bankrupt or are placed in liquidation.
- Breach, cancellation, termination or material amendment of the respective Timecharters.
- Breach, cancellation, termination or material amendment by Boa Deep C AS of its obligations under the Bareboat Charter.







- Lessor become insolvent, bankrupt or is placed in liquidation, the Bareboat Charter and any rights of quiet enjoyment afforded the Lessor shall be terminated.
- Borrowers or Guarantors have a material adverse change.

Where applicable, the Events of Default shall have remedy periods acceptable to the Subordinated Lenders and the Borrowers.

**Conditions Precedent:** Usual and customary for transactions of this size, type and purpose including:

1. No material adverse changes.
2. Commitment from a lender acceptable to the Subordinated Lenders to provide a barge fleet loan of NOK 200,000,000-250,000,000 to be closed on or prior to the Closing Date.
3. Completion of the sale of the *Boa Rover* on terms and conditions acceptable to Fokus Bank and the Arrangers.
4. Execution and delivery of all documentation in form and substance satisfactory to the Subordinated Lenders.
5. Satisfactory review of the Vessel Management Agreements.
6. No event of default or potential event of default has occurred under existing obligations of the Borrowers, the Guarantors or any of their subsidiaries unless waived in writing by the Senior Lenders for a period of time after the Closing Date, as agreed between the Senior Lender and the Subordinated Lenders.
7. At or prior to the Closing Date any overdue taxes owed by the Borrowers shall be paid.
8. The Borrowers to provide a detailed three (3) year business plan including consolidated income statement and balance sheet projections with full disclosure of all off balance sheet liabilities.
9. Satisfactory due diligence on the Borrowers and the Guarantors.
10. Satisfactory coordination agreement with the Senior Lender.
11. Consent of the Lessor.
12. Consent of the Senior Lender, Fokus Bank, GIEK, Greenway Offshore Pte Ltd and Greenway Holding.
13. Receipt of an independent insurance report confirming that all insurances over the Collateral Vessels are satisfactory.
14. Satisfactory inspection of the Collateral Vessels.

**Disclosure:** Except as required to sell all or a portion of their participation, each of the Borrowers and the Subordinated Lenders agree not to discuss the Transaction, or the terms and conditions hereof with any party (except with its relevant officers and employees, its outside legal counsel, its outside lenders, its outside accounting firm, appraisers, consultants and/or brokers, and other transaction parties as required to satisfy the terms and conditions of this letter).







| | |
|---|---|
| Expenses: | All legal and other expenses incurred related to this transaction shall be for the account of the Borrowers whether the transaction closes or not. |
| Broker fees: | Any fees due and payable to Pareto shall be for the account of Boa and the Borrowers acknowledge that these are the only fees payable in conjunction with this transaction. |
| Taxes/Set off: | Any payment to any party by the Borrowers to be made free and clear of any taxes, reserve, levy or duty. |
| Law: | Norwegian law. |

We hereby accept the terms and conditions outlined herein and mandate the Arrangers to arrange the Facility.

AGREED AND ACCEPTED:

DATE: _17. SEPTEMBER 2010_

NAME: _OLE T. BJORNEVIK_

TITLE: _SHIPOWNER._





*Appendix A*

*Permitted Capital Expenditures:*

- Equipment Suppliers
- BB 36 Newbuilding
- Tug 1 + Tug 2  + Tug 3 + Tug 4 Newbuildings (remaining expenditures 4 x 60 MNOK) under construction at Uzmar Shipbuilding Industry and Trade Inc. , Turkey