UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - :
NORTHERN SHIPPING FUNDS I, L.L.C., :     12 Civ. 3584 (JCF)
                                   :
              Plaintiff,           :          OPINION
                                   :        AND ORDER
      - against -                  :
                                   :
ICON CAPITAL CORP., BOA SUB C AS,  :
BOA DEEP C AS, BOA HOLDING AS,     :
BOA OFFSHORE AS, and               :
TAUBATKOMPANIET AS,                :
                                   :
              Defendants.          :
- - - - - - - - - - - - - - - - - - - :
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

     The plaintiff, Northern Shipping Funds I, LLC ("Northern"),
brings this action against defendant Icon Capital Corporation
("Icon"), asserting claims of unjust enrichment and money had and
received.   The parties consented to proceed before me for all
purposes pursuant to 28 U.S.C. § 636(c), and a bench trial was
held on July 28 and 29, 2014.  This opinion constitutes my findings
of fact and conclusions of law as required by Rule 52 of the
Federal Rules of Civil Procedure.

The Evidence

     A.   The Boa Transaction

     Northern provides private capital for shipping and offshore

industries worldwide.  (Tr. at 10).[1]  Icon is an "independent
equipment leasing and financing company" working with entities in
"a wide range of industries, including the maritime industry."  Boa
Sub C AS, Boa Deep C AS, Boa Holding AS, Boa Offshore AS, and
Taubăkompaniet AS (collectively, "Boa"), who were previously
defendants in this case, are Norwegian entities that provide
offshore services such as "barge transportation, rig moves, coastal
towages, and salvage operations."  In January 2010, Icon and
Northern began discussing an arrangement to refinance some of Boa's
outstanding loans (Backer Exh. 2); they contemplated doing so
jointly because neither was able to provide all of the necessary
financing by itself.  (Tr. at 142, 258).  Icon and Northern
exchanged draft contracts setting forth the proposed terms of the
potential deal (Backer Exhs. 3-7), and conducted due diligence,
including preparing memoranda, inspecting vessels, obtaining
insurance reports, and arranging market reports (Tr. at 39-40,
259).  Northern internally reviewed the proposal and froze funds in

---

[1]  "Tr." refers to the trial transcript, "Def. Exh." to the
defense exhibits received in evidence at trial, and "Backer Exh.,"
"Bjornevik Exh.," and "Add'l Exh." to the plaintiff's exhibits
received at trial in three separate binders that were so labeled.
Unless noted by reference to either the trial transcript or
exhibits, the facts set forth here were determined on the
previously decided motion for summary judgment.  Northern Shipping
Funds I, LLC v. Icon Capital Corp., __ F. Supp. 2d __, 2014 WL
700198 (S.D.N.Y. 2014).

preparation for the deal (Tr. at 34-35; Add'l Exh. 4); Icon may have taken similar steps, although it is unclear if funds were frozen or formal approval was sought or received (Tr. at 303-11).

On September 16, 2010, Northern and Icon sent Boa a proposed contract (the "Commitment Letter" and "Term Sheet") under which Northern and Icon, acting jointly as the "Arrangers," would provide Boa with a $70,000,000 loan (the "Transaction").  These documents were drafted on paper that bore the logos of both Northern and Icon on the top of each page.  The Commitment Letter had spaces for C. Tobias Backer, the Senior Director of Icon responsible for shipping-related offshore investments (Tr. at 254-55), and John Hartigan, the senior investment advisor at Northern in charge of European business (Tr. at 31), to sign jointly "[o]n behalf of the Arrangers."  Mr. Backer signed the letter, but neither party has located a copy with Mr. Hartigan's signature.  (Tr. at 37-38, 143, 312).  Ole T. Bjornevik, Boa's Chairman, executed the contract by signing the Term Sheet on behalf of Boa on September 17, 2010. (Backer Exh. 8).  The parties agree that the Commitment Letter and Term Sheet constituted a binding contract between Boa and both Arrangers, Icon and Northern.

The Term Sheet set forth details regarding the financing arrangement, Boa's payment obligations, consequences of a default on the loan, and conditions precedent to the Transaction.  Of the

$70 million in financing, Icon was to provide $25 million and Northern was to provide $17.5 million of its own capital and bring in $27.5 million from other investors.  In addition to interest on the loan, Boa was required to pay two fees -- an "Arrangement Fee" of 1.5% of the $70 million loan total, or $1,050,000, and an "Upfront Fee" of 2% of the loan amount, or $1,400,000.  According to Mr. Hartigan and Sean Durkin, Northern's president (Tr. at 144), the Upfront Fee was to be distributed among the lenders according to the amount of capital brought to the transaction (Tr. at 33, 48-49, 146, 149), while Northern and Icon would divide the Arrangement Fee.  The Commitment Letter, however, did not set forth how the parties would divide either of these fees.  (Tr. at 148).  Upon the execution of the contract, Boa paid Icon a $300,000 deposit on the Arrangers' fee to cover the expenses Icon and Northern incurred in preparation for closing the Transaction.  (Backer Exh. 8).

The Term Sheet also included liquidated damages clauses in the event Boa was unable or unwilling to go forward with the Transaction.  In the event that Boa "actively or constructively" broke off from the negotiation, it would pay one-half of the 1.5% Arrangement Fee, or $525,000, and one-half of the 2% Upfront Fee, or $700,000, plus costs and expenses, less the amount already paid as a deposit.  According to Mr. Backer, the liquidated damages clauses were included because Boa had pulled out of previous

similar financing arrangements, including an earlier iteration of the deal with Icon and Northern, and because Boa generally had a reputation in the industry for not following through on such commitments. (Tr. at 256-59, 302).

After signing the Commitment Letter and Term Sheet in September, Northern and Icon worked with outside counsel to prepare final deal documents while Boa worked to meet the conditions precedent outlined in the Term Sheet, with the hope of closing the Transaction by the end of 2010. (Tr. at 262; Backer Exh. 11). None of the transaction documents between Northern and Icon were finalized or executed (Tr. at 43, 147, 165-66), but the parties engaged in substantive negotiations and prepared draft documents that were close to final form (Tr. at 77). One such document was the Junior Loan Facility Agreement, a draft of which stated, in Section 24.5(b), that:

> A Recovering Finance Party is not obliged to share with any other Finance Party any amount which [it] has received or recovered as a result of taking legal or arbitration proceedings, if: (i) it notified the other Finance Party of the legal or arbitration proceedings; and (ii) the other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

(Def. Exh. 6). Mr. Backer testified that the Junior Loan Facility

Agreement was "fully negotiated," "substantially complete," and ready to be signed (Tr. at 262, 287-90), while Mr. Hartigan testified that such documents were always subject to "last minute changes" (Tr. at 77). The fee letter, which would have laid out the fee-sharing arrangement between Icon and Northern, had not yet been drafted.

B. <u>Breach of Contract and Demand</u>

In a December 15, 2010 e-mail, Boa unilaterally withdrew from the Transaction, claiming that the refinancing had "proven to be more complicated and [] taken [a] much longer time to conclude than we all have anticipated." Northern and Icon both allege that they were ready to execute the Transaction at that time.

After discussing and exchanging draft responses with Northern representatives (Backer Exhs. 13-16), on December 23, 2010, Mr. Backer sent an e-mail to Mr. Bjornevik on behalf of both Arrangers demanding payment of "the fees, costs and expenses that are payable by you under the Commitment Letter in the case where the Borrower terminates the Transaction closing process." (Def. Exh. 8; Backer Exhs. 15, 16). According to a table contained in the e-mail, Boa owed $1,437,180.52 as a result of its breach of contract, comprising $1,225,000 in liquidated damages as set forth in the Term Sheet, plus the travel expenses of Icon and Northern representatives and fees owed by the Arrangers to third parties for

legal services, market studies, and vessel inspections.  The e-mail acknowledged Boa's prior payment to Icon of $299,985, and demanded the remaining sum of $1,137,195.52 be paid to Icon's bank account by December 31, 2010.  (Def. Exh. 8).

C.  Icon's Lawsuit

On January 7, 2011, after Boa failed to make the demanded payment, Mr. Backer forwarded to Mr. Hartigan an e-mail from David Verlizzo, one of Icon's in-house attorneys (Tr. at 205), informing him that Icon had engaged counsel to begin drafting a complaint and inquiring whether Northern would "split" the legal fees of a lawsuit against Boa (Def. Exh. 9).

In an internal e-mail to Mr. Durkin on the same date, Mr. Hartigan expressed concerns about the potential time, cost, and negative publicity that a lawsuit against Boa would involve.  (Def. Exh. 9).  Northern was troubled by Boa's finances, fearing that possible bankruptcy would make collection of any judgment difficult (Tr. at 174), and it also had reservations related to Icon's approach to and control of the litigation.

On January 17, 2011, Mr. Hartigan e-mailed Mr. Backer indicating that he needed more time to talk to Northern's counsel before committing to joining Icon in filing a lawsuit against Boa. (Def. Exh. 10).  In a January 31, 2011 e-mail, Mr. Hartigan informed Mr. Durkin that Icon had retained outside counsel to file

a lawsuit, that the "amount under dispute is approximately $1,137,195 of which [Northern] would be entitled to 50%," that the litigation expenses could reach as much as $150,000 if Boa refused to settle, and that Northern was still owed its portion of the money remaining from the deposit. (Def. Exh. 11). On February 8, 2011, Mr. Hartigan informed Mr. Backer that he would recommend Northern not join Icon's lawsuit. (Def. Exh. 12).

At some point during the period in which Icon and Northern were considering how to pursue liquidated damages from Boa, they agreed to split equally the balance of the $300,000 deposit that remained after expenses were covered. (Tr. at 55, 231; Def. Exhs. 9, 11). Mr. Hartigan sought reimbursement for Northern's outstanding expenses (Def. Exh. 10) and asked for its share of the remainder after all expenses were paid (Def. Exh. 12). In a February 8 e-mail, Mr. Hartigan suggested that payment of this remainder would be "the price for [Icon] to take over [Northern's] claim as underwriters." The parties later agreed that Icon, which received the deposit payment from Boa, would pay Northern its share of that remainder after the lawsuit pending against Boa was resolved. (Def. Exh. 18; Tr. at 279). To date, Icon has not paid Northern its half of the deposit balance, totaling $42,250. (Tr. at 55, 59, 230-31).

On February 24, 2011, the principals from Northern and Icon

8

met at a Marine Money conference in Hamburg, Germany.  (Tr. at 294).  Mr. Hartigan and Mr. Durkin testified that, at this meeting, Northern conveyed to Icon its reservations about joining the lawsuit and its preference for pursuing a "commercial settlement" prior to initiating litigation.  (Tr. at 58-59, 153, 272).  They suggested that the Arrangers send Boa a draft complaint to facilitate resolution of the dispute prior to filing a lawsuit. (Tr. at 58, 152, 174-75, 272).  Mr. Backer was skeptical but said he would consult counsel (Tr. at 294); while Mr. Hartigan was under the impression Icon would agree to send a letter to encourage settlement (Def. Exh. 13), Mr. Durkin recalled being told at the conference that Icon would not send a draft complaint (Tr. at 159-60).  In any event, Icon decided shortly thereafter that it would not pursue this approach.  (Tr. at 272, 294-96).

Northern's representatives also alleged that at this meeting they asked for but never received a draft version of the complaint (Tr. at 103, 172-75); Mr. Backer denied that such a request was made, and claimed that the meeting was primarily focused on Northern's lack of interest in joining the lawsuit due to negative publicity (Tr. at 264-65).  Finally, Mr. Hartigan and Mr. Durkin testified that they informed Mr. Backer that Northern had a right to some portion of the fees resulting from Boa's breach.  (Tr. at 58, 61, 156).  In the only apparent memorialization of this

conversation, Mr. Durkin e-mailed Mr. Backer several months later and recalled the subject of the discussion in Hamburg as being "how to proceed [with] our collective claim against Boa for the fees due." (Def. Exh. 22; Tr. at 62).

On March 14, 2011, Icon filed its lawsuit against Boa to recover liquidated damages from the failed Transaction (the "Prior Action"). <u>Icon Capital Corp. v. Boa Sub C AS</u>, No. 11 Civ. 1746 (S.D.N.Y. March 14, 2011). Northern was not a party to the Prior Action, and Icon made no reference to it in the Complaint. Icon demanded no less than $1,111,100.68 including lost interest income -- a figure equal to the damage calculations contained in the prior e-mail demand less $26,094.84, the amount attributable to Northern's expenses. (Tr. at 243-44; Def. Exh. 14).

Icon representatives did not notify Northern by letter or fax that they had filed the lawsuit against Boa, nor did they send Northern a copy of the complaint. (Tr. at 252-53). Mr. Backer testified that neither Mr. Hartigan nor Mr. Durkin asked for a copy of the complaint after it was filed. (Tr. at 271). Sometime in late March, however, Icon's counsel spoke to Mr. Hartigan and informed him that Icon had brought suit "in [its] own name." (Def. Exh. 15).

D.  <u>Dispute Between Icon and Northern Over the Prior Action</u>

In late March, 2011, just a few weeks after the Prior Action

was filed, Northern learned that Boa was looking at alternative sources for refinancing its debt, alleviating some of the concerns about Boa's possible bankruptcy. (Tr. at 63). In an internal e-mail discussion at Northern, Mr. Durkin suggested to Mr. Hartigan that he tell Icon it would be "a good time to demand payment from Boa" since Boa "can't raise cash if they are being sued." (Def. Exh. 15). Mr. Hartigan responded with the information that Icon had already filed suit in its own name because he had told Icon's representatives that Northern "did not want to be part of [the Prior Action]," a statement he now regretted. (Def. Exh. 15). Mr. Durkin asked Mr. Hartigan whether Icon had sent a copy of the complaint, and whether Northern had signed anything waiving its rights. (Def. Exh. 16). Mr. Hartigan reassured Mr. Durkin that Northern had neither signed any agreement waiving or assigning its claims or rights nor told Icon that it would forgo the opportunity to join the Prior Action, although it had declined to participate thus far. (Def. Exh. 17). Mr. Hartigan did note, however, that Mr. Verlizzo had recently told him that Icon had filed suit as "the sole prosecutor with [Northern's] name not mentioned." (Def. Exh. 17).

On April 1, Mr. Hartigan and Mr. Backer received an e-mail containing information about Boa's new refinancing deal, prompting Mr. Hartigan to tell Mr. Backer that he now thought that Icon was

"right to file that law suit." (Def. Exh. 19).  There is no record of any communications between Icon and Northern representatives between April 1 and May 20, 2011.

On May 19, 2011, Mr. Hartigan told Mr. Durkin that he had reached out to Mr. Bjornevik and proposed a meeting to settle fees from the Transaction; Mr. Durkin cautioned that settlement negotiations should not proceed "without having Icon on board," and informed Mr. Hartigan that he had just asked Northern's lawyers to obtain a copy of Icon's lawsuit. (Def. Exh. 21; Tr. at 113-14). The next day, Mr. Durkin e-mailed Mr. Backer informing him of Northern's planned meeting with Boa and its continued preference to settle rather than litigate the fee claim, particularly in light of Boa's improved financial status.  (Def. Exh. 22).  Mr. Durkin informed Mr. Backer that Northern had not waived its rights to settle its claim, but that it did not wish to block Icon's efforts to pursue claims against Boa through litigation, noting that "Northern Shipping Funds owns a share of the claims you are pursuing in the lawsuit."  Finally, Mr. Durkin recognized that he was uncertain of "the legal aspects of how decisions shall be made related to [our] joint claim" and that Northern "may need to engage [its] own attorneys on this matter."  (Def. Exh. 22).

Mr. Backer replied in a May 24, 2011 e-mail.  (Def. Exh. 22). He recalled that at the February meeting in Hamburg the parties had

discussed how seeking a commercial settlement was unwise, as it might undermine the potential lawsuit. He also suggested that, after several failed attempts to engage Boa in settlement discussions, Boa's alleged newfound willingness to negotiate was likely the result of Icon's lawsuit.   Mr. Backer expressed disbelief that Northern was only now interested in the litigation having previously "ma[de] it clear in both emails and conversations . . . that Northern had no interest in participating in any lawsuit against Boa for reputational reasons."   Mr. Backer rejected the notion that Northern had "a right to share in Icon's claims," stating that this was "simply not the case" and that "Icon will not share any recovery it receives from Boa with Northern Shipping as any claim will be legal in nature, not commercial."   Mr. Backer concluded his reply to Mr. Durkin and Mr. Hartigan by stating that if Northern now wanted to pursue its share of the fees given Boa's "improved financial position," then Icon "encourage[s]" Northern to "commence [its] own proceedings."   (Tr. at 274-76; Def. Exh. 22).

Northern did not bring its own lawsuit; nor did it object directly to Mr. Backer's assertion that it would retain all of the fees being sought in the Prior Action.   Rather, Mr. Hartigan met with Mr. Bjornevik on May 25, 2011, in an attempt to jump start settlement discussions.   (Def. Exh. 23; Tr. at 121).   At this meeting, Northern informed Boa that although it "could join" Icon's

lawsuit against Boa, it was "not a party to the suit as that is not how [Northern] approached such matters" and was "not what [Northern] wanted to do." (Exh. 23; Tr. at 125-26). At trial, Mr. Hartigan offered another rationale for why Northern did not decide to sue Boa after receiving Mr. Backer's reply, testifying that Northern did not enter the litigation at that stage because Icon had already sued for the total amount of fees due and it "wouldn't make sense to duplicate lawsuits," apparently reflecting Northern's belief that it did not need to sue because Icon would have to get Northern's approval to settle its own case. (Tr. at 121-23).

During the May 25 meeting, Mr. Bjornevik apparently expressed an interest in settling its fees with Northern and Icon, but wanted to discuss the possibility with Mr. Backer; Mr. Hartigan told Mr. Bjornevik that Northern representatives should speak to Mr. Backer first. Mr. Hartigan suggested to Mr. Durkin that they call Mr. Backer to discuss a possible joint resolution and to ensure that Northern would be "free to settle" with Boa if Icon continued to pursue its lawsuit, despite the fact that Icon had made a claim "for all the money" owed under the Commitment Letter. (Def. Exh. 23).

Mr. Hartigan reached out to Mr. Backer to discuss the meeting with Boa; after Mr. Backer indicated he would not withdraw Icon's lawsuit because he did not believe Boa would settle and thus

14

declined to speak with Northern representatives, Mr. Hartigan and Mr. Durkin exchanged e-mails drafting a response. (Def. Exhs. 24, 25). Mr. Hartigan indicated that Northern's counsel thought Icon's lawsuit was on "thin ice," and relayed his impression that Mr. Bjornevik was upset by Icon's actions and determined to fight the lawsuit. He also drafted language raising concerns that Boa would not settle with Northern if Icon was still pursuing a claim to "all" of the fees and expenses, putting Icon and Northern in an "awkward position" of simultaneously demanding the same money from Boa. (Def. Exh. 24). Mr. Durkin removed most of this language from the draft e-mail, and Mr. Hartigan ultimately sent Mr. Backer an e-mail on May 31, 2011, highlighting Mr. Bjornevik's apparent eagerness to settle the claims and reasserting that Northern had not waived rights to a portion of Boa's fees. (Def. Exhs. 25-26). The e-mail also stressed Northern's view that because both parties had an interest in the claims against Boa, the best solution would be for Icon and Northern to agree on a way forward, even if that meant proceeding simultaneously with both litigation and settlement negotiations. (Def. Exh. 26). Mr. Hartigan candidly informed Mr. Backer that he was "not comfortable moving forward with a settlement without having Icon on board." (Def. Exh. 26).

Mr. Backer did not immediately respond to this e-mail, despite Mr. Hartigan's urging that they "strike while the opportunity is

hot." (Def. Exhs. 26, 28-29). While awaiting Mr. Backer's response, Mr. Hartigan and Mr. Durkin discussed the possibility that Icon would not cooperate, in which case either Northern and Boa could settle without Icon's approval or Northern could formalize a claim against Icon. (Def. Exh. 29; Tr. at 132-33). However, Mr. Backer responded a few days later, on June 3, 2011. (Def. Exh. 30). He stated that he was "disappoint[ed]" that Northern was now asserting an interest in a lawsuit it had previously declined to join as a result of Boa's response to the Icon-financed lawsuit. Mr. Backer once again informed Northern's representatives that Icon would continue to pursue its claims for the full amount owed by Boa and that "any proceeds received from Boa as a result of [the Prior Action] will be retained by Icon." (Tr. at 133-34; Def. Exh. 30).

Recognizing that Mr. Backer's response could put Northern and Icon on a "collision course" in their parallel pursuit of fees from Boa (Def. Exh. 31; Tr. at 130-31, 134), Mr. Hartigan asked Mr. Bjornevik on June 8, 2011, to contact Mr. Backer and affirm Boa's interest in settling the entire matter. (Def. Exh. 32). Mr. Bjornevik e-mailed Mr. Backer on June 10, 2011, stating that Boa was "prepared to [] settle the fee (Upfront Fee and Arrangement fee) [that Boa owes] Icon/Northern," and asked whether Icon was interested in settling the matter. Mr. Hartigan and Mr. Durkin

16

were copied on that e-mail.  (Def. Exh. 33).  Mr. Backer responded
to Mr. Bjornevik's e-mail but did not include the representatives
from Northern (Tr. at 68, 73), and when Boa confirmed that it was
prepared to pay the full amount demanded in the December 23, 2010
e-mail, Mr. Backer informed Mr. Bjornevik that such a payment
"would be in consideration for withdrawing Icon's lawsuit."
(Bjornevik Exh. 8).  It appears that no further actions were taken
in this round of settlement negotiations; Boa did not respond to
Mr. Backer's e-mail or subsequent phone calls and did not pay the
demanded fees.  (Tr. at 325-29).

     In mid-June, representatives from Northern and Icon attended
another Marine Money conference in New York City.  (Tr. at  65).
Mr. Hartigan testified that he and Mr. Durkin met with Mr. Backer
regarding the status of the lawsuit and to see if they "could come
to an agreement" on how to move forward, given that they were both
seeking resolution of the same claim.   (Tr. at 65-67, 164).
According to Mr. Durkin, "the tension between Icon and Northern had
escalated" prior to this meeting, as the parties were headed down
"two different yet competing paths."  (Tr. at 163).  Mr. Backer
apparently maintained the position that because Icon had filed the
lawsuit, it had full rights over the asserted claims and any
proceeds obtained as a result.  (Tr. at 67, 179).  Mr. Backer does
not recall meeting with Northern representatives at this

conference.  (Tr. at 282, 331-33).

Having been left out of the e-mail communications between Icon and Boa, Mr. Durkin responded to Mr. Backer's June 3, 2011 e-mail one month later, on July 5, 2011.  (Def. Exh. 34).  He reiterated Northern's position that "[it] ha[d] not assigned the benefit of [its] claim" to Icon, that it was Icon who rejected Northern's original proposals to pursue non-litigation settlement strategies to resolve the dispute, that it was Boa's stronger financial status rather than Icon's lawsuit that renewed Northern's interest in and Boa's willingness to settle, and that Icon had not given Northern any opportunity to provide input regarding the initiation of the Prior Action or retention of counsel.  Mr. Durkin also repeated Northern's consistent position that "a commercial settlement is in [the Arrangers'] best interest."  (Def. Exh. 34).

There is no evidence that Mr. Backer responded to this e-mail. On July 15, 2011, Mr. Hartigan e-mailed Mr. Backer to inquire whether there were any developments with Boa; Mr. Backer responded that he had re-sent the original demand but did not receive a response from Boa.  (Def. Exh. 35).  Mr. Backer also informed Mr. Hartigan that Icon had obtained a default judgment against Boa earlier that week.  Northern periodically checked in on the status of Icon's lawsuit, although it relied primarily on Boa for such information because, according to internal e-mails, Icon would not

disclose any information about the lawsuit to Northern.   (Def.
Exhs. 36, 38; Tr. at 138).   Northern never intervened in Icon's
suit, apparently believing that Icon would either settle for half
of the fees or ask Northern for a release of its own claims.

    E.   <u>The Settlement Agreement</u>

Icon moved for and obtained default judgment against Boa on
July 11, 2011.   Boa moved to vacate the default judgment, citing
improper service of process.   On December 9, 2011, prior to a
decision on that motion to vacate, I presided over a settlement
conference in an attempt to resolve the case.   Icon and Boa entered
into a settlement agreement effective January 1, 2012 (the
"Settlement Agreement"), under which Boa agreed to pay Icon
$750,000 in exchange for dismissal of the Prior Action. (Def. Exh.
41).

After agreeing to the settlement in principle, counsel for
Icon and Boa began drafting the Settlement Agreement and exchanged
e-mails regarding the implications of Northern's role in the
Transaction on the settlement contract. (Def. Exhs. 39-40).   Boa
sought language releasing it from any claims by Northern, a request
Icon rejected.   Boa's counsel then argued that because Northern was
"a party to the Commitment Letter, [Boa] need[s] either a release
from [Northern] or an agreement from Icon to indemnify Boa for any
claim or loss that Northern Shipping may claim against [Boa]."

(Def. Exh. 40).  Icon's counsel responded that Icon "cannot give Boa a release from Northern as it is an entirely independent entity," that "Northern is not a party to the litigation and is not signatory to the Commitment Letter and Term Sheet between Icon and Boa," and that Icon "cannot agree to indemnify Boa from a claim made by Northern for these reasons."  (Def. Exh. 40).  Boa's counsel recalled that Icon had previously "indicated that Northern would not bring a litigation or sue"[2] and asked for "elabora[tion] . . . so that I can give my client some comfort that they can settle with you and not worry about Northern coming after them for the rest."  (Def. Exh. 40).  Icon's counsel addressed these concerns by proposing the following language, which was ultimately accepted by Boa's counsel and included in the final Settlement Agreement:

> Icon represents that, to the best of its knowledge, Northern Shipping Fund I LLC ("Northern") has not executed the Commitment Letter.  Icon further represents that it made

---

[2]  According to Boa, prior to the settlement conference it asked Icon how a settlement could occur without Northern's participation as co-Arranger, to which Icon's counsel responded that "Northern Shipping declined to participate in the lawsuit because it recognized it did not sign the Commitment Letter and, thus, did not have any rights" under the contract; Icon denied this allegation.  The parties agree that at the settlement conference Boa asked Icon to clarify "whether Northern had -- or may assert in the future -- rights associated with the Commitment Letter," and expressed reservations about settling the Prior Action without Northern's "consent and participation."

> Northern aware of its intention to file the subject lawsuit between Icon and Boa.   To the best of Icon's knowledge, Northern has not made nor does it intend to make a claim against Boa related to the Commitment Letter or this litigation.

(Def. Exh. 41).

Boa claimed that it signed the Settlement Agreement based on these representations, because it believed that it was paying the "full amount . . . due from Boa to the 'Arrangers' under the Commitment Letter, not just to Icon" and that "the settlement resolved all disputes related to the Commitment Letter that the Arrangers could assert."   Boa also asserted that Icon never disclosed the communications it had with Northern in which Northern asserted rights to a portion of Icon's claim.

Around January 13, 2012, Mr. Hartigan spoke to Mr. Bjornevik, who informed him that Boa had settled the Prior Action with Icon. Mr. Hartigan then spoke to Mr. Backer, who confirmed that the parties had settled.   Northern sent a letter to Icon and Boa claiming that it was "the rightful owner of 50% of the interest in the Commitment Letter, the Judgment, and the Settlement Payment" and demanding half of the settlement amount, "reserv[ing] the right to bring a legal action . . . against both Icon and [Boa] to enforce its rights under the Commitment Letter."   Icon's counsel rejected the demand, noting that Northern had declined to participate in the lawsuit and never signed the Commitment Letter.

21

Counsel for Northern once again demanded that Icon pay Northern 50% of the settlement proceeds, and also demanded half of the remainder of the $300,000 deposit, or approximately $42,250. Icon has not paid Northern the amounts demanded.

Discussion

    A.   Unjust Enrichment

        1.  Legal Standard[3]

In order to prove its unjust enrichment claim, the plaintiff must demonstrate that the defendant was enriched at the plaintiff's expense, and that it is "against equity and good conscience to permit [the defendant] to retain what is sought to be recovered." Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 182, 919 N.Y.S.2d 465, 471 (2011) (internal quotation marks omitted); see also Old Republic National Title Insurance Co. v. Luft, 52 A.D.3d 491, 491-92, 859 N.Y.S.2d 261, 262 (2d Dep't 2008). "[A] claim for unjust enrichment will lie only where the defendant possesses money or received a benefit which in equity and good conscience the defendant should not retain because it belongs to the plaintiff." Sobel v. Eggleston, No. 12 Civ. 2551, 2013 WL 1344712, at *5 (S.D.N.Y. March 28, 2013) (alteration in original) (emphasis

---

     [3]  The parties agree that New York law governs the claims at issue. Northern Shipping, __ F. Supp. 2d at __, 2014 WL 700198, at *12.

omitted) (internal quotation marks omitted).  The plaintiff must prove this claim by a preponderance of the evidence.  Marini v. Adamo, No. 08 CV 3995, 2014 WL 1426028, at *2 (E.D.N.Y. April 15, 2014); Schatzki v. Weiser Capital Management, LLC, No. 10 Civ. 4685, 2014 WL 347396, at *1 (S.D.N.Y. Jan. 29, 2014); Thurber v. Thurber, 281 A.D.2d 410, 411, 721 N.Y.S.2d 288, 288 (2d Dep't 2001).

     2.  Application

Icon was clearly enriched by its $750,000 settlement with Boa. But that settlement neither released Boa from Northern's claim nor precluded Northern's collection of damages amounting to half of the fees sought, and was thus not directly at Northern's expense. Northern Shipping, __ F. Supp. 2d at __, 2014 WL 700198, at *23. In the summary judgment opinion, I speculated that Icon's actions in pursuit of the entire amount of liquidated damages, without pleading Northern as a party under Rule 19, may have resulted in an intangible benefit.  Id.  Icon could have gained leverage in its lawsuit against Boa by obtaining default judgment on a claim that included some portion of liquidated damages that would have been payable to Northern, and then used that enhanced leverage to negotiate a settlement with Boa while Boa's motion to vacate the default judgment was pending.  That settlement, meanwhile, may have made Boa less inclined or financially able to settle with Northern.

At trial, however, Northern offered no evidence suggesting that this scenario was anything more than a hypothetical possibility. Boa claimed in its summary judgment submissions that it entered into the Settlement Agreement because it believed it was settling with both Arrangers, but Northern did not call any witnesses from Boa to test the reasonableness of that assertion or establish that Boa would not have been able and willing to subsequently settle with Northern despite its agreement with Icon. Indeed, as Northern's counsel suggested at trial, proving that Icon used Northern's interest to leverage its own negotiations with Boa would suggest that any misdeeds by Icon came at Boa's expense more than at Northern's. (Tr. at 355, 362-63).

Instead of advancing this intangible benefits argument, Northern contended at trial that Icon's $750,000 settlement with Boa was inequitable because Northern would have shared in such proceeds had they been obtained after the Transaction closed, had Boa paid the fees demanded in the December 2010 e-mail, or had Northern joined Icon's lawsuit (Tr. at 319-20); Icon would never have been able to complete the Transaction or collect any fees whatsoever without Northern's contribution (Tr. at 75-76, 364); and Icon got more than what Northern believes was its fair share -- half of the original demand (Tr. at 355). These arguments may suggest unfairness, but the evidence at trial does not establish

24

unjust enrichment.

i.  <u>The Complaint</u>

Northern claimed that it had reservations about joining the lawsuit because of Icon's "their way or the highway" approach to selection of counsel and control of the litigation strategy.  (Tr. at 54, 86, 160).  Mr. Verlizzo acknowledged that Icon was intent on filing a lawsuit against Boa whether Northern decided to join it or not (Tr. at 221), and Icon's contention that it offered Northern an opportunity to provide input on litigation counsel and was "open to suggestions" (Tr. at 206-07) is undermined by the fact that a law firm had already been engaged and the complaint was already being drafted when Icon first asked Northern whether it would join the suit (Def. Exh. 9).  However, at that early stage in January 2011, Northern representatives never articulated concerns about the firm Icon had selected to draft the complaint and did not make any requests for input into litigation strategy beyond expressing a desire to seek a settlement before filing suit.  (Tr. at 86-87, 210-11).  Mr. Hartigan could not identify any information sought by Northern that Icon refused to provide at that time (Tr. at 86-87).

Northern's representatives alleged that at the February Marine Money conference meeting with Mr. Backer, they asked for but never received a draft version of the complaint (Tr. at 103, 172-75), although Mr. Backer denied that such a request was made (Tr. at

264-65).   Northern's version is more credible in light of contemporaneous statements that Icon would not divulge information unless and until Northern joined the lawsuit (Def. Exh. 17) and in light of Icon's rejection of Northern's request that a draft be sent to Boa.  Nevertheless, Icon's conduct did not prevent Northern from asserting its rights in the dispute and does not rise to the level of inequitable conduct.

Finally, Icon omitted Northern from the Complaint in the Prior Action, even though it was arguably required to plead Northern as a co-plaintiff under Rule 19 of the Federal Rules of Civil Procedure.[4]  Although the failure to join Northern may have been

---

[4]  Rule 19(a) provides in pertinent part as follows:

A person . . . must be joined as a party if:

*   *   *

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Rule 19(c), in turn, provides that if a necessary party is not joined, the plaintiff must nevertheless identify that party and

26

misleading to the Court, it should not have been to Northern.  Both Boa and Northern were aware of the lawsuit and the underlying facts behind it; Northern was given an opportunity to join it and declined to do so; Northern was notified immediately after filing that it was not mentioned in the lawsuit and that Icon was the "sole prosecutor," contrary to Mr. Hartigan's testimony that they did not read the complaint and were not aware of its content until several months later (Tr. at 94-95, 155, 170); Icon encouraged Northern to file its own lawsuit; and Northern could have but did not insert itself into the Prior Action or initiate its own litigation.[5]  Thus, while Icon's behavior in excluding Northern from drafting the Complaint and refusing to share draft versions was uncooperative, it was ultimately Northern's own decision to remain on the sidelines that prevented it from participating in the settlement with Boa.

    ii.  <u>Representations and Warranties</u>

Icon has consistently argued that the representations it made

---

indicate the reasons for not joining it.

    [5]  The fact that Northern representatives did not think they needed to "duplicate lawsuits" by suing for the same amount of fees claimed by Icon (Tr. at 122-23), or were not sure whether they could "push" themselves into Icon's lawsuit (177-78), does not alter this analysis, particularly as Northern had already engaged counsel to advise them on the matter.

in the Settlement Agreement with Boa were true.  Northern's counsel conceded that they were "literally true" but "sharp."  (Tr. at 359).  While Icon's statements may have been aggressive and not entirely forthcoming, Northern failed to prove that they were sufficiently misleading or that they omitted important information. Icon's actions did not unreasonably induce Boa to sign the agreement without involving Northern in the settlement process, such that it would be unjust to allow Icon to retain the proceeds obtained in part through those representations.

The first representation Icon made was that, to the best of its knowledge, Northern had not signed the Commitment Letter.  This was technically true -- Northern representatives apparently did not sign a final version of the contract.  Mr. Verlizzo, the attorney at Icon who drafted the settlement language, testified that Icon had gone through their systems and determined that Northern had not signed the Commitment Letter, although he acknowledged that he did not ask Northern whether Mr. Hartigan had in fact signed it.  (Tr. at 234-35).  Mr. Durkin also acknowledged that there was no record of a Commitment Letter that was signed by Northern.  (Tr. at 183). Boa previously alleged that this representation was intended to suggest that Northern believed it was not a signatory party to the contract and thus could not sue to enforce its right to fees, but Northern did not articulate such a claim nor provide any evidence

to support it.  Though Icon's diligence in ascertaining whether Northern had signed the contract may have been lacking, the statement, even without the knowledge qualifier included by Icon, appears to be true.

Icon's second representation was that it had "made Northern aware of its intention to file the subject lawsuit between Icon and Boa."  Mr. Durkin testified that Northern was aware (through its own efforts rather than notification by Icon) that Icon was going to file a lawsuit, although it did not know the content of the complaint.  (Tr. at 184).  The evidence at trial shows that Icon did, in fact, make Northern aware of the lawsuit -- it explicitly offered Northern an opportunity to participate in the lawsuit before it was filed (Def. Exh. 9); the parties discussed the lawsuit numerous times, including at the February conference; and Icon's counsel told Mr. Hartigan about the complaint within days of its filing (Exhs. 15, 17).  Icon did not represent that it sent Northern a copy of the complaint or consulted on its content; it merely asserted, truthfully, that it had made Northern aware of its intention to file suit against Boa to collect the fees.  (Tr. at 269).

The final and most disputed of the representations was that, to the best of Icon's knowledge, "Northern has not made nor does it intend to make a claim against Boa related to the Commitment Letter

or this litigation." Mr. Verlizzo admitted that he had only two communications with Northern representatives, both of which occurred in January 2011 before the lawsuit was filed (Tr. at 218-19), but he testified that he also based this representation on conversations with Mr. Backer. (Tr. at 236-37). Northern argued that this representation of its litigation position was grossly misleading, and that despite Northern's nonparticipation in the Prior Action and its repeated statements, including to Boa itself, that it did not want to litigate, it still had a claim to fees.

The parties appear to have different conceptions of what it means to "make a claim." Mr. Durkin testified that, as he understood it, a "claim" does not necessarily mean litigation; thus, Northern was pursuing a claim for fees against Boa through commercial channels and had asserted a right to a portion of Icon's claim as well. (Tr. at 185-87). Mr. Verlizzo testified that he understood "mak[ing] a claim" to mean bringing a legal action against Boa, in contrast to "owning" a claim that would be pursued commercially (Tr. at 215-16, 238), and that the representation thus reflected his belief that Northern had no intention of suing Boa. Icon also emphasized that this representation contained a knowledge qualifier that covers Icon's different interpretation of the language.

Icon has also consistently argued that it should not be held

responsible for Boa's failure to understand Northern's position, particularly given that Northern and Boa were in communication at that time.  Indeed, Northern informed Boa directly that it believed it could join the Prior Action but that it did not wish to take that approach in favor of seeking a commercial settlement.  This exchange alone suggests either that Boa should have known Northern had a claim for fees against it, or that Boa also understood "claim" to mean only an intent to litigate.

It is true, as noted in the opinion denying summary judgment, that Icon had knowledge of Northern's assertion of an interest in the fees, whether characterized as a "claim" or not.  For example, Mr. Backer encouraged Northern to bring its own lawsuit in his May 24, 2011 e-mail, background information that was not conveyed to Boa while negotiating the representations in the Settlement Agreement.  On the other hand, this representation must be read in the context of its origin.  Icon refused Boa's request to provide a release from Northern as part of the settlement (Def. Exh. 40); while Icon may have believed that Northern would not bring a claim against Boa in court, it could not say so with any certainty (as evidenced by the knowledge qualifier) or with any authority to speak on Northern's behalf (as evidenced by the refusal to release Boa from claims by Northern).  This alone should have served as a warning to Boa that it could not rely on Icon's statements for a

guarantee of what Northern might do.

Icon's representations were reasonable although, as with any negotiation, they may have been made in such a way as to maximize the likelihood of inducing agreement while minimizing obligations or exposure.  Ultimately, Icon had reason to believe that Northern was not going to sue Boa, and it understood its representation to say just that.  To the extent that any misunderstandings arose from this language, it is equally attributable to Northern's statement to Boa disavowing any interest in joining a lawsuit and to the failure of both Northern and Boa to communicate their respective positions to each other regarding the status of claims and desire for universal settlement.

### iii.  50/50 Agreement

Northern asserted that there was an "undisputed" agreement to split the Arrangement Fee from the transaction evenly between Icon and Northern (Tr. at 361), whether implicitly, as suggested by Mr. Hartigan (Tr. at 36, 64), or, as Mr. Durkin recalled, explicitly in an agreement made during a meeting at Icon's offices in early 2010 (Tr. at 146).

As discussed in the summary judgment opinion, whether there was an implied or express agreement to split fees is _not_ an uncontroverted fact; Icon has denied such an agreement, and Northern did not provide any additional evidence at trial.

Northern Shipping, __ F. Supp. 2d at __, 2014 WL 700198, at *22. Furthermore, as discussed both in the summary judgment order and in the denial of Northern's motion for leave to amend to include oral and implied contract claims, an agreement to split fees does not entitle Northern to a share of Icon's settlement proceeds; the Arrangement Fee and the settlement proceeds are distinct, and any agreement to split the former (which Icon never collected) does not necessarily imply an agreement to split the latter. Northern's assertion that there was an agreement to split the Arrangement Fee evenly thus has little weight in assessing whether Icon's settlement unjustly enriched it at Northern's expense.

### iv. Junior Loan Facility Agreement

Not only did Northern fail to demonstrate that Icon's behavior was inequitable, it did not rebut trial evidence suggesting that Icon's actions were reasonable.

In the summary judgment decision, I noted that it would be curious if Northern and Icon had agreed to divide fees from the transaction but resort to a "free for all" in the event collection efforts were required. Northern Shipping, 2014 WL 700198 at *24 n.10. Yet that is precisely what the draft Junior Loan Facility Agreement provides. The language in Section 24.5(b) clearly states that if a financing party decided to take legal action against Boa, it was not obliged to share any proceeds from that action provided

33

that it notified the other lending parties of the lawsuit, gave them an opportunity to participate, and those other parties did not join or take separate legal action.  That is what happened here -- Icon notified Northern of its intention to file a lawsuit, gave Northern the opportunity to participate, and Northern declined to join the Prior Action and failed to initiate its own separate legal action against Boa.  Pursuant to the terms of that agreement, Icon would not have been obligated to share any of the proceeds it obtained from its settlement with Boa.

Mr. Hartigan acknowledged that he was aware of this language, as it was standard in such contracts.  (Tr. at 80).  However, Northern disputed that this document was binding, arguing that it was never executed and that, even if it had been, Icon did not give proper notice of the lawsuit to trigger Section 24.5(b) of the draft agreement.  (Tr. at 356-57).  Mr. Hartigan was informed of the lawsuit and the fact that Icon was the "sole prosecutor" shortly after it was filed, although such notice was not made by letter or facsimile as provided in the draft financing agreement. (Def. Exh. 17).  But in any case, the lack of an executed document would only preclude a contract claim; the existence of the draft Junior Loan Facility Agreement and the evidence that both parties understood its terms <u>does</u> inform the analysis of a claim for unjust enrichment.

Northern and Icon are sophisticated parties that negotiated a large commercial contract, including Section 24.5(b).  Northern's representatives knew there was a proposed agreement stating that if a notified party chose to take no action while a co-lender initiated a lawsuit, that party would not be entitled to any fruits of the litigation.  While Icon assumed the risks of litigation (Tr. at 335-37), Northern assumed the risks of playing "wait-and-see" (Tr. at 358) rather than joining the lawsuit or suing Boa itself to assert its entitlement to a share of the claims, as contemplated by Section 24.5(b).  Although the draft agreement did not bind the parties, it undermines Northern's argument that Icon acted unjustly or in violation of any prior fee-splitting agreement when it sought the full amount of fees in its litigation against Boa.

v.  Northern's Behavior

To the extent that Icon's actions in its pursuit of litigation against and settlement with Boa were "sharp," Northern's behavior was correspondingly dull.  In two separate e-mails, Mr. Backer told Northern representatives that Icon would not share any of the proceeds obtained from the litigation against Boa.  Northern did not attempt to join the suit, did not sue on its own, and did not take any meaningful steps to avoid what it had already perceived as a "collision course," one that led directly to the present dispute.  Northern maintained a position that it would not join the lawsuit

and communicated that to both Icon and Boa, yet it never informed those parties that it believed any settlement of the Icon litigation required Northern's consent.  (Tr. at 358).

Northern's claim of unjust enrichment against Icon therefore fails.

B.  <u>Money Had and Received</u>

1.  <u>Legal Standard</u>

To succeed on its claim for money had and received, Northern must prove that Icon received money belonging to Northern, that Icon benefitted from receiving that money, and that the principles of equity and good conscience require Icon to give up some of that money.  <u>Swan Media Group, Inc. v. Staub</u>, 841 F. Supp. 2d 804, 809 (S.D.N.Y. 2012) (citing <u>State v. International Asset Recovery Corp.</u>, 56 A.D.3d 849, 852, 866 N.Y.S.2d 823, 826 (3d Dep't 2008)). The party asserting the claim must prove it by a preponderance of the evidence.  <u>Marini</u>, 2014 WL 1426028, at *2.

2.  <u>Application</u>

As discussed above, the settlement proceeds that Icon obtained from Boa are distinct from any fees due to the Arrangers under the Term Sheet.  That $750,000 was paid by Boa to Icon in consideration for Icon dropping its lawsuit.  It did not belong to Northern and it is not inequitable to allow Icon to retain it as the proceeds from the litigation that it alone pursued despite the time, risk,

and potential negative publicity.

Separate from the settlement proceeds, Icon received a roughly $300,000 deposit from Boa at the time the Commitment Letter was executed. After the payment of all expenses incurred in anticipation of the Transaction, approximately $84,500 of that deposit remained. At some point the parties agreed that they would split this remainder evenly, but Icon has not yet given Northern its share.

At trial, Icon argued that Northern sold its claim to Icon in exchange for the remainder of the deposit and agreed not to pursue any money beyond the deposit. (Tr. at 22, 89, 106-07, 211-12, 268, 338-40). This position was based on Mr. Hartigan's February 8, 2011 e-mail to Mr. Backer in which he said that payment of the deposit remainder would be "the price for [Icon] to take over [Northern's] claim as underwriters." According to Icon, because Northern pursued additional fees in 2011 and has continued to do so through this lawsuit, it forfeited the agreed-upon portion of the deposit remainder.

There is no basis in the record for finding that Northern assigned its rights to Icon. Mr. Hartigan clearly states in the e-mail that he had to "circulate a memo" concerning this "recommend[ation]," and he testified that he never sought approval for such a recommendation and no follow-up offer was given. (Tr.

37

at 56-57).   Indeed, Icon never asked Northern to waive or assign its claim formally (Tr. at 59), and Northern never did so (Backer Exh. 25; Tr. at 64-65, 158-59, 221).   There are no written documents suggesting that a waiver or assignment of rights was given, and no mention of assigned rights in the complaint in the Prior Action or in Icon's subsequent communications with Boa or Northern.   (Tr. at 357-58).   Although Mr. Hartigan e-mailed a contact at Barclay's, one of the other investors in the transaction, on February 28, 2011, suggesting that Northern would assign its claim to Icon (Def. Exh. 13), Mr. Hartigan testified that his statement was an error, and in any event that e-mail was never conveyed to Icon.   (Tr. at 90-92).   Nothing else in the record, apart from this suggestive e-mail language, supports Icon's contention that Northern assigned its claim in exchange for deposit money they had already agreed to split and that Icon was merely holding on Northern's behalf.

The deposit was an advance on the Arrangement Fee and was thus due to both Icon and Northern, with Icon receiving it as agent for the Arrangers.   (Tr. at 107, 323).   Icon has thus received money belonging to Northern and has benefitted from it.   Given the clear understanding of all involved that the remainder would be evenly divided, principles of equity require Icon to give Northern half of the money remaining from the deposit, $42,250.00.

Conclusion

Based on the evidence presented at trial, the plaintiff sustained its burden of demonstrating that Icon is in possession of the remainder of the $300,000 deposit, a portion of which is owed to Northern; however, it failed to carry the burden of demonstrating that Icon was unjustly enriched by settling the prior litigation with Boa. Accordingly, the Clerk of Court shall enter judgment in favor of the plaintiff and against Icon in the amount of $42,250.00 and close this case. Any pending motion is denied as moot.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          September 4, 2014

Copies mailed this date:

Phillip R. Schatz, Esq.
Kristin Marlowe, Esq.
Wrobel & Schatz LLP
1040 Avenue of the Americas
11th Floor
New York, NY 10018

Thomas O. Johnston, Esq.
Porzio, Bromberg & Newman, P.C.
156 West 56th Street, Suite 803
New York, NY 10019

39